1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF SERGIO GARCIA-VASQUEZ, ARANZA VASQUEZ-REGALADO, an individual and minor, by and through her guardian ad litem, STEPHEN G. LINCOLN, DIEGO VASQUEZ-REGALADO, an individual and minor, by and through his guardian ad litem, STEPHEN G. LINCOLN,<br><br>                                    Plaintiffs,<br><br>        vs.<br><br><br>COUNTY OF SAN DIEGO, a municipal corporation, DEPUTY JOHN SPACH, an individual, DEPUTY SHAWN AITKEN, an individual, CAPTAIN ROB AHERN, an individual, and DOES 1-100, inclusive,<br><br>                                    Defendants. | CASE NO. 06CV1322-LAB (LSP)<br><br>**ORDER:**<br><br>**(1)  GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; and**<br><br>**(2)  DENYING AS MOOT JOINT MOTION TO CONTINUE PRETRIAL CONFERENCE AND RELATED DATES**<br><br><br><br>[Dkt No. 29, 39] |

        This matter is before the Court on defendants' Motion For Summary Judgment ("Motion") in this  42 U.S.C. § 1983 ("Section 1983") civil rights action arising out of the fatal shooting of Sergio Garcia-Vasquez ("Garcia-Vasquez") by sheriff's deputies.  The remaining plaintiff is the informal estate of Garcia-Vasquez, purportedly represented by the decedent's common-law wife, a resident of Mexico.  Garcia-Vasquez's two minor children, appearing through their guardian *ad litem* Stephen G. Lincoln, were dismissed as party plaintiffs.

Plaintiff filed an Opposition to the Motion, and Defendants filed a Reply.  Pursuant to Civil Local Rule 7.1(d)(1), the court finds the issues presented appropriate for decision on the papers and without oral argument. For the reasons discussed below, the Motion is **GRANTED**.

I.    **BACKGROUND**

On July 28, 2005, San Diego County Sheriff Deputies John Spach, Shawn Aitken, and a third officer responded to a report of a disturbance at the residence where Garcia-Vasquez rented a room in the home of Pedro Ramirez and his wife, Asuncion Perea Cortez, in Vista, California.  A confrontation ensued inside the house.   Both Deputy Spach and Deputy Aitken ultimately shot Garcia-Vasquez, with Deputy Aitken's shot killing him.

For purposes of deciding this Motion, the parties' Joint Statement Of Undisputed Facts establishes two deputy sheriffs, including defendant Spach, had contact with Garcia-Vasquez the evening before the shooting. Dkt No. 38.  The deputies responded at that time to Pedro Ramirez's report of Garcia-Vasquez's strange conduct in claiming his "wife" was missing.  Garcia-Vasquez repeated that contention to Deputy Spach.  The deputy took a missing persons report from him.  Several hours later, about 1:00 a.m. on July 28, 2005, the officers returned to the residence after Garcia-Vasquez had placed several calls to the Sheriff's communications center.  He met them outside the residence.  Deputy Spach asked him in Spanish if he had weapons, drugs, or needles.  Garcia-Vasquez answered affirmatively, and deputy Spach decided to perform a pat-down.  The deputy asked him to turn around.  Garcia-Vasquez turned away, then turned back to face the officer.  He turned around again when the officer told him to, but then ran into the residence, slamming closed the security screen door, and laughed.  The officers left.

That afternoon, Ms. Perea called her husband at his work to say Garcia-Vasquez accused her of hiding his wife.  Garcia-Vasquez behaved violently toward her, and she locked herself in a room away from him while he pounded on the locked door.  That evening, three deputies, including Spach and Aitkin, responded to a dispatch call regarding a fight or disturbance at the same residence.  Mr. Ramirez and Ms. Perea were there and let the

deputies into the residence, telling them Garcia-Vasquez was not acting normal and directing them to his bedroom.  Deputy Spach went to the closed bedroom door.  He heard Garcia-Vasquez talking on the other side.  He announced his presence and that Sheriff personnel were present and asked Garcia-Vasquez to open the door.   He received no response.  He checked the door and found it unlocked.  He opened the door and saw Garcia-Vasquez on the telephone.  He instructed him to put the phone down and come out of the room.  Deputy Spach saw him put the phone down and scream.  Garcia-Vasquez reached under the bed and pulled out two cast iron dumbbells, holding one in each hand in a pugilistic stance. Deputy Spach backed away and yelled at Garcia-Vasquez to put down the weights.  When he did not do so, deputy Spach took out his OC pepper spray and sprayed Garcia-Vasquez in the face, with no effect.  Garcia-Vasquez charged the deputy in a "walk-run."  Deputy Spach backed into the living room and drew his handgun from its holster, while Garcia-Vasquez continued advancing, swinging the weights in a windmill fashion.  Garcia-Vasquez threw his right-hand weight at deputy Spach, who blocked it with his arm.  The weight hit his arm and fell to the floor.  The deputy pointed his gun at what he thought was Garcia-Vasquez's center of mass and fired a first round without wounding him.  Garcia-Vasquez continued to advance on Spach, who retreated around a sofa to the other side of the room, then fired a second round at Garcia-Vasquez which (other undisputed evidence establishes) hit him in the right thigh, but he continued to advance toward deputy Spach in an attack with the dumbbell.  Aitken Decl. ¶ 9; Spach Decl. ¶ 10; Ramirez Depo. 23:12-24:5; Perea Depo 30:13-31:18.  Deputy Aitken was positioned on the back side of the sofa, with his arm reaching over the sofa and his gun pointed at Garcia-Vasquez's head.  He did not fire at that moment because the other residents were down range of his line of fire.  Deputy Aitkin lowered his aim, stepped to his right, and shot Garcia-Vasquez, hitting and killing him.[1]

---

[1]  The Estate objects to two statements in the Spach Declaration submitted in support of the Motion as purportedly contradicting his deposition testimony and the post-shooting interview he gave detectives, which he reaffirmed at his deposition.   Opp. 18:4-16.  Both statements are his descriptions of where his attention was focused (on Garcia-Vasquez's face and right hand near his pocket) in the seconds leading up to the fatal shot.   The Court does not rely on that alleged inconsistency as material to this decision.  Plaintiff's additional objection on the same ground against a statement in the Aitkin Declaration is similarly immaterial to this decision, and both objections

At the time of that incident, Robert Ahern was the captain of the Sheriff Department's Vista Patrol Station.   The Joint Statement includes the observation he issued no recommendation regarding the use of Tazers or alternatives to the use of lethal force as a result of the Garcia-Vasquez event.

Plaintiff the Garcia-Vasquez Estate ("Estate" or "Plaintiff") filed this action through the self-described personal representative of the Estate, Elizabeth Sorely Regalado-Hernandez ("Regalado"), the common-law wife of Garcia-Vasquez, who resides in Oaxaca, Mexico.[2] Compl. ¶ 3.  The Complaint names as defendants the County of San Diego, Deputies Spach and Aitken, and Captain Robert Ahern (collectively "Defendants").   Following the Court's Order granting in part and denying in part Defendants' Motion To Dismiss (Dkt No. 13), the only remaining plaintiff is the Estate, and the remaining claims are:  the Third Cause of Action, a Section 1983 claim of Excessive Force alleged against Spach and Aitken; the Fourth cause of action, a Section 1983 <u>Monell</u>[3] claim alleged against the County of San Diego; the Fifth Cause of Action, a Section 1983 Supervisory Liability claim alleged against Ahern; the Seventh Cause of Action, a state law battery claim alleged against Spach, Aitken, and the County of San Diego; and the Eighth Cause of Action, a state law negligence claim alleged against all the defendants.[4]

## II.  DISCUSSION

### A.  <u>Legal Standards</u>

#### 1.  <u>Summary Judgment</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue

---

appear to attempt to raise credibility issues which have no place in a summary judgment determination.

[2]  The Court granted Defendants' Motion To Dismiss the two minor children of the decedent, by Order entered December 27, 2006, for lack of standing.

[3]  <u>Monell v. New York City Dept. of Soc. Serv.</u>, 436 U.S. 658 (1978).

[4]   Although dismissal of  the Sixth Cause of Acton was denied on the theory of dismissal presented, that claim is pled solely on behalf of the minor children, who are no longer parties to this action.  Accordingly, on that basis, that claim does not survive.

1  as to any material fact and the moving party is entitled to judgment as a matter of law." Rule

2  56(c). "A material issue of fact is one that affects the outcome of the litigation and requires

3  a trial to resolve the parties' differing versions of the truth." S.E.C. v. Seaboard Corp., 677

4  F.2d 1301, 1305-1306 (9th Cir. 1982). Summary judgment must be entered "if, under the

5  governing law, there can be but one reasonable conclusion as to the verdict." Anderson v.

6  Liberty Lobby, Inc. 477 U.S. 242, 250-251 (1986).  However, "[i]f reasonable minds could

7  differ," judgment should not be entered for the moving party.  Id.

8  The moving party bears the initial burden of identifying the elements of the claim in

9  the pleadings, or other evidence, which that party "believes demonstrates absence of a

10  genuine issue of material fact." Celotex v. Catrett, 477 U.S. 317, 323 (1986).  The burden

11  then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine

12  issue for trial. Celotex, 477 U.S. at 324;  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989)

13  ("Summary judgment is only appropriate if, viewing the evidence in the light most favorable

14  to the party opposing the motion, the court finds that there is no genuine issue of material

15  fact and the movant is entitled to judgment as a matter of law").  Only material factual

16  disputes can create a genuine issue for trial.  Facts unnecessary to the decision under the

17  applicable substantive law are not material.  Anderson, 477 U.S. at 242, 248.

18  Conclusory allegations unsupported by evidence do not suffice to defeat a properly

19  supported motion for summary judgment. Hansen v. United States, 7 F.3d 137, 138 (9th Cir.

20  1993) (per curiam).  The non-moving party may not simply rely on its pleadings in opposition

21  to the motion, nor can the non-moving party create a genuine issue of fact simply by making

22  argumentative assertions in legal memoranda.  S.A. Empresa, Etc. v. Walter Kidde & Co.,

23  690 F.2d 1235, 1238 (9th Cir. 1982).  To successfully rebut a properly supported motion for

24  summary judgment, the nonmoving party "must point to some facts in the record that

25  demonstrate a genuine issue of material fact and, with all reasonable inference made in the

26  plaintiff[]'s favor, could convince a reasonable jury to find for the plaintiff[]" applying a

27  preponderance of the evidence standard. Reese v. Jefferson School Dist. No. 14J, 208 F.3d

28  736, 738 (9th Cir. 2000), citing Rule 56, Celotex, 477 U.S. at 323, Anderson, 477  U.S. at

249, 252.   The non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in his or her favor.  <u>Anderson</u>, 477 U.S. at 255.

## 2.    Section 1983 Civil Rights Claims

To prevail on a civil rights claim, a plaintiff must prove both that (1) a person acting under color of state law committed the conduct at issue, and (2) the conduct deprived the plaintiff of some right, privilege, or immunity protected by the Constitution or laws of the United States.  42 U.S.C. §1983; <u>Leer v. Murphy</u>, 844 F.2d 628, 632-33 (9th Cir. 1988); <u>Jensen v. Lane County</u>, 222 F.3d 570, 574 (9th Cir. 2000).

> 42 U.S.C. § 1983 creates a cause of action against a person who, acting under color of state law, deprives another of rights guaranteed under the Constitution.  Section 1983 does not create any substantive rights; rather it is the vehicle whereby plaintiffs can challenge actions by governmental officials.  To prove a case under section 1983, the plaintiff must demonstrate that (1) the action occurred "under color of state law" and (2) the action resulted in the deprivation of a constitutional right or federal statutory right.

<u>Jones v. Williams</u>, 297 F.3d 930, 934 (9th Cir. 2002) (citation omitted); <u>Graham v. Connor</u>, 490 U.S. 386, 393-94 (1989) (Section 1983 " is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred") (citation omitted).

There is no *respondeat superior* or vicarious liability cognizable in 42 U.S.C. § 1983 actions.  <u>Monell v. New York city Dept. of Soc. Serv.</u>, 436 U.S. 658 (1978); <u>Jones</u>, 297 F.3d at 934.  A supervisor cannot be held personally liable by virtue of his or her position.  Rather, liability can only be predicated on actual knowledge a constitutional violation was occurring with failure to act to prevent the harm, actual participation, or directing subordinates to cause the violation.  <u>Taylor</u>, 880 F.2d at 1045.

## 3.    Fourth Amendment Excessive Force Analysis

"Police officers . . . are not required to use the least intrusive degree of force possible. Rather, . . . the inquiry is whether the force that was used to effect a particular seizure was reasonable, viewing the facts from the perspective of a reasonable officer in the scene." <u>Forrester v. City of San Diego</u>, 25 F.3d 804, 807-08 (9th Cir. 1994), *citing* <u>Graham</u>, 490 U.S.

at 396.  "The force which was applied must be balanced against the *need* for that force: it

is the need for force which is at the heart of the consideration of the Graham factors."

Alexander v. City and County of San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1994).   For

Fourth Amendment analysis, "[t]he question is whether the officers' actions are 'objectively

reasonable' in light of the facts and circumstances confronting them, without regard to their

underlying intent or motivation."  Graham, 490 U.S. at 397.

> Because the test of reasonableness under the Fourth
> Amendment is not capable of precise definition or mechanical
> application, however, its proper application requires careful
> attention to the facts and circumstances of each particular case,
> including the severity of the crime at issue, whether the suspect
> poses an immediate threat to the safety of the officers or others,
> and whether he is actively resisting arrest or attempting to evade
> arrest by flight.

Graham, 490 U.S. at 396 (internal quotation marks and citations omitted).

Under Fourth Amendment jurisprudence, "the most important single element" in the

Graham analysis is "whether the suspect posed an immediate threat to the safety of the

officers and others."  Chew v. Gates, 27 F.3d 1432, 1441 (9th Cir. 1994). The

reasonableness determination is made as of the time of the incident:

> The "reasonableness" of a particular use of force must be
> judged from the perspective of a reasonable officer on the
> scene, rather than with the 20/20 vision of hindsight. . . . The
> calculus of reasonableness must embody allowance for the fact
> that police officers are often forced to make split-second
> judgments – in circumstances that are tense, uncertain, and
> rapidly evolving – about the amount of force that is necessary in
> a particular situation.

Graham, 490 U.S. at 396-97 (internal quotation marks and citations omitted).

**B.**   **Capacity To Sue And Relation Back Doctrine**

**1.**   **Estate Lacks The Requisite Formal Representative**

As a threshold matter, the Court addresses Defendants' contention the Estate has no

official representative and therefore the action lacks a plaintiff with the capacity to sue for the

survivor claims of the decedent under the remaining causes of action.  Rule 17(b) provides,

in pertinent part:

> Capacity to sue or be sued is determined as follows:  (1) for an
> individual who is not acting in a representative capacity, by the

law of the individual's domicile; . . . (3) for all other parties, by the
law of the state where the court is located. . . .

The parties disagree as to which subdivision of Rule 17 applies in this circumstance. Defendants rely on Rule 17(b)(1) to contend under California law, standing to represent a decedent's estate must be established through evidence of a duly appointed representative or a successor in interest of the decedent, citing CAL. CODE CIV. P. § 377.30 and CAL. PROB. CODE § 9820.  Absent such capacity, third parties cannot litigate claims on behalf of a decedent.  Defendants represent Garcia-Vasquez was a foreign national from Mexico without legal or permanent status in the United States.  They surmise his domicile is likely to be his home in Oaxaca, Mexico.  They argue the "action by the estate therefore appears facially defective and subject to dismissal because there is no estate under California law and plaintiffs have not alleged any other legal basis for proceeding with this action in the name of a non-existent estate" through decedent's common law wife.  Mot. 24:13-17.

The real party in interest and capacity rules are not jurisdictional, unlike the Article III "case or controversy" standing requirement, but rather exist to ensure the plaintiff, rather than some third party, is entitled to make the claim.  *See* Ensley v. Cody Resources, Inc., 171 F.3d 315, 319 (5th Cir. 1999); *see also* Pacific Coast Agr. Export Ass'n v. Sunkist Growers, Inc., 526 F.2d 1196, 1208 (9th Cir. 1975). The substantive law, whether state or federal, controls the real party in interest analysis with respect to the claim, although in diversity actions, state law determines whether the plaintiff is the proper party to maintain the action.  Allstate Ins. Co. v. Hughes, 358 F.3d 1089, 1093-94 (9th Cir. 2004). When an original party is not the real party in interest with respect to the claim sued upon, a real party in interest may be substituted.  Rule 17(a)(1) ("An action must be prosecuted in the name of the real party in interest").  The real party in interest is the person who has the right to sue under the substantive law, rather than others who may merely be interested in or benefit from the litigation.  U-Haul Int'l, Inc. v. Jartran, Inc., 793 F.2d 1034, 1038 (9th Cir. 1986).

Plaintiff argues Rule 17(b)(3), providing the capacity of an individual who is acting as a representative to sue or be sued is determined "by the law of the state where the court is located," rather than subdivision (1), is the correct standard to apply. Opp. 30:7-11. Plaintiff

further argues a probate proceeding was not a necessary prerequisite to the filing of this lawsuit, arguing CAL. CODE CIV. P. § 377.30 does not apply to Ms. Regelado-Hernandez because that provision applies to actions commenced by "successors in interest," whereas she purports to be the Estate representative. Opp. 30:12-14. A decedent's cause of action, if it survives that person's death, "passes to the decedent's successor in interest, . . . and an action *may be commenced by* the decedent's personal representative *or, if none, by the decedent's successor in interest*."[5] CAL. CODE CIV. P. § 377.30. The Estate must appear through a real party in interest, acting in a representative capacity. The Estate is not a "person" suing as an "individual." Accordingly, Rule 17(b)(3), rather than Rule 17(b)(1), applies, and party capacity analysis must be determined under the law of the forum state. Streit v. County of Los Angeles, 236 F.3d 552, 565 (9th Cir. 2001) (city police department's capacity to be sued in federal court determined by state law).

Plaintiffs purported to commence this action on behalf of the decedent through the Estate's personal representative. An estate or trust is not a legal entity and is without capacity to sue or be sued because assets must be held by an executor, administrator, or a trustee on behalf of the estate beneficiaries. *See* Karras v. Teledyne Industries, Inc., 191 F.Supp.2d 1162, 1170-73 (S.D.Cal. 2002). A decedent's estate is no more than a collection of assets and liabilities, and requires a real party in interest, such as a duly appointed executor or administrator of the estate, for purposes of pursuing litigation. *See* Tanner v. Best's Estate, 40 Cal.App.2d 442, 445 (1940). Plaintiffs offer no evidence to refute or to create a triable issue of fact regarding Ms. Regelado-Hernandez's lack of any formal authority to act on behalf of Garcia-Vasquez's Estate. The Court finds as a matter of law Garcia-Vasquez has no official personal representative who may commence or maintain an action in this District with respect to those causes of action that may have survived his death, \\

---

[5]    The California Probate Code defines "personal representative" as:  "executor, administrator, administrator with the will annexed, special administrator, successor personal representative, public administrator acting pursuant to Section 7660, or a person who performs substantially the same function under the law of another jurisdiction governing the person's status." CAL. CODE CIV. P. § 58.

1   on his behalf or on behalf of his estate, and Ms. Regelado-Hernandez has not demonstrated

2   she is his successor in interest, leaving no cognizable plaintiff.

3   **2.    Request To Reinstate Dismissed Party Plaintiffs In A New Capacity**

4       Associated with its Opposition, the Estate requests a "substitution of parties" through

5   the Declaration of Stephen G. Lincoln, the guardian *ad litem* for Garcia-Vasquez's two minor

6   children.   Those originally-named plaintiffs were dismissed from this action for lack of

7   standing to pursue tort claims on their own behalf in the Court's December 27, 2006 Order

8   granting in part and denying in part Defendants' Motion to Dismiss. The children were not

9   represented to be Garcia-Vasquez's "successors in interest" in the pleading of the Complaint

10  for purposes of pursuing the decedent's survivorship claims.

11      Plaintiff appears to concede Ms. Regelado-Hernandez's credentials to represent the

12  Estate may be lacking: "Rather than argue over whether, under Mexican law, a common law

13  spouse has standing to commence or to continue a pending action or proceeding as the

14  decedent's successor in interest," applying Rule 21 "misjoinder of parties" principles,[6]

15  Plaintiff seeks "to substitute, through their court appointed guardian ad litem," the two

16  children "who clearly have such standing [as successors in interest]," who will "act on their

17  behalf *or* on behalf of the Estate."  Opp. 31:6-10) (emphasis added).   In response to

18  Defendants' having "called into question" the right of Ms. Regelado-Hernandez to function

19  as the Estate's personal representative, Mr. Lincoln seeks leave to prosecute the

20  survivorship claims on behalf of the minor children and requests he be "substituted as the

21  same in lieu and place of the Estate and/or" Ms. Regelado-Hernandez. Opp. 30:25-31:10;

22  Opp. Exh. 14. "[C]laims brought by executors and guardians ad litem . . . are representative

23  claims." Peterson v. John Crane, Inc., 154 Cal.App.4th 498, 509 (2007) (where wife sued

24  in her capacity as an individual (loss of consortium), in her capacity as successor-in-interest

25  to her husband's claims (survivor tort claims), and as her husband's legal heir (wrongful

26  death claims), none of those capacities was representative).

27  _____

28      [6]  "Misjoinder of parties is not a ground for dismissing an action.  On motion or on its own, the court may at any time, on just terms, add or drop a party.  The court may also sever any claim against a party."  Rule 21.

Merely being the real party in interest does not necessarily confer capacity to sue. "Capacity" refers to the party's personal right to litigate in federal court. "Real party in interest" refers to whether the person has the substantive right being sued upon. Rule 17(b); *see* Esposito v. United States, 368 F.3d 1271, 1273 (10th Cir. 2004) (an individual's domicile provides the law to apply to a determination of capacity issues; the "identify of the real party in interest is determined by referring to the governing substantial law"). Garcia-Vasquez's children initially appeared in this action as plaintiffs suing (through their guardian *ad litem*) on their own behalfs, not in a representative capacity or successors in interest to their deceased father. If they are reinstated in the action, it would be in the latter, different capacity, again not a representative capacity. *See* Peterson, 154 Cal.App.4th at 193-94.

Defendants contend the statute of limitations bars such a reinstatement of those dismissed parties in a new capacity. "The limitations period for actions brought under 42 U.S.C. § 1983 should be taken from the statute governing actions for personal injuries in the state where the claim arose." Johns v. County of San Diego, 114 F.3d 874, 878 n.2 (9th Cir. 1997). In substituting parties, the relation back doctrine applies, as long as the new plaintiff is not seeking to enforce an independent right or to impose greater liability on the defendant. Quiroz v. Seventh Ave. Center, 140 Cal.App.4th 1256, 1279 (2006). Defendants argue any "successor in interest" status of the children now attempted to be asserted through their guardian *ad litem* would be separate and distinct from their capacity as initially pled in this action. They argue the statute of limitations would bar any such substitution, "even if they were to plead and now establish successor in interest capacity, . . . and there would be no relation back to the original filing of the complaint in this matter because of their separate plaintiff party capacities." Reply 4:5-15.

> Unlike a cause of action for wrongful death, a survivor cause of action is not a new cause of action that vests in the heirs on the death of the decedent. It is instead a separate and distinct cause of action which belonged to the decedent before death but, by statute, survives that event. [Citation.] . . . . [¶] A cause of action that survives the death of a person passes to the decedent's successor in interest and is enforceable by the "decedent's personal representative or, if none, by the decedent's successor in interest." (Code Civ. P. § 377.30.) In the typical survivor action, the damages recoverable by a

> personal representative or successor in interest on a decedent's cause of action are limited by statute to "the loss or damage that the decedent sustained or incurred before death. . . ." (Code Civ. P. § 377.34.)

Quiroz, 140 Cal.App.4th at 1264-65, *citing* Grant v. McAuliffe, 41 Cal.2d 859, 864 (1953) (a survivor claim is a statutory cause of action; however, unlike a wrongful death claim, the survival statues do not *create* a cause of action but merely prevent the abatement of the decedent's cause of action and provide for its enforcement by the decedent's personal representative or successor in interest).

There is no dispute the Complaint was timely filed, within one year of Garcia-Vasquez's death, and it contains survivor causes of action, to wit, use of excessive force, battery, and negligence.  The issue becomes whether the successor-in-interest children can be substituted at this late date in place of Ms. Regelado-Hernandez, now shown to be an improper representative of the Estate.  Unlike in Quiroz, the issue here is not whether the *claim* relates back to the initial timely filing of the action, since no new claims are proposed and the time to amend the pleading is long past.  The issue here is whether the *party* substitution is permissible to save the action, with the children in their successor-in-interest capacity not previously asserted relating back to the initiation of the litigation.

> The relation-back doctrine deems a later-filed pleading to have been filed at the time of an earlier complaint which met the applicable limitations period, thus avoiding the [statute of limitations] bar.  In order for the relation-back doctrine to apply, "the amended complaint must (1) rest on the *same general set of facts*, (2) involve the *same injury*, and (3) refer to the *same instrumentality*, as the original one.  [Citations.]"  Norgart v. Upjohn Co., 21 Cal.4th 383, 408-09 (1999).  In addition, "a new plaintiff *cannot* be joined after the statute of limitations has run where he or she seeks to enforce an *independent right* or to impose greater liability upon the defendant."

Quiroz, 140 Cal.App.4th at 1278.

Here, the "independent right" of the minor children has already been dismissed through Defendants' Motion To Dismiss.  If the substitution of the minor children as successors in interest to their father, in place of the purported Estate representative, were permitted, no different injury would be introduced than in the initial complaint statement of the survivor causes of action.  The same "general set of facts" would remain unchanged, and

the same "instrumentality" would remain.  If the requested change is properly construed as a "mere technical substitution of the proper party plaintiff on a previously existing claim," rather than "distinct claims technically asserted by different plaintiffs seeking compensation for different injuries," such substitution would be proper irrespective of any statute of limitations issue, because the relation back doctrine would apply.  Quiroz, 140 Cal.App.4th at 1277-78 (holding the doctrine of relation back did not apply to a survivor claim first attempted to be added in an Amended Complaint because the one-year statute of limitations on the survivor claim had already passed, even though the original complaint, which contained one cause of action for wrongful death, was timely filed within one year from the decedent's death, because the court construed the plaintiff (decedent's mother) as technically a "different plaintiff,"  acting in one capacity on the wrongful death claim, and in a separate capacity on the survivor cause of action which pled a different injury).

> A claim that is first asserted by amendment after the limitations period has passed will not be barred so long as the amendment is based on the same general set of facts and involves the *same injury*.  This holds true even where the amendment names or substitutes a new party plaintiff, as long as the new plaintiff is not seeking to enforce an independent right or to impose a greater liability on the defendant [such as through factually changed allegations asserting wholly distinct legal obligations].

Quiroz, 140 Cal.App.4th at 1279, *citing, inter alia*, Klopstock v. Superior Court, 17 Cal. 2d 13, 20-22 (1941); Garrison v. Board of Directors, 36 Cal.App.4th 1670 (1995) (relation-back doctrine applied to save identical cause of action stated by substituted plaintiff since no new or different obligation was alleged by amendment).

Substitution of plaintiffs under Rule 17(a) to join the real party in interest is liberally allowed when the change does not alter the factual allegations in the original pleading as to the events or the participants.  *See* Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 20 (2nd Cir. 1997).  When permitted, such joinder, substitution, or ratification by the real party in interest validates the action from the outset:  "the action proceeds as if it had been originally commenced by the real party in interest."  Rule 17(a)(3).  Such validation from the outset occurs irrespective of whether the statute of limitations had run on the claim in the meantime.  Advanced Magnetics, 106 F.3d at 20-21.

> An amended pleading will also relate back if it makes a mere technical change in the capacity in which the plaintiff sues on the same cause of action . . . or substitutes a plaintiff with standing in place of a plaintiff who lacks standing. . . . [¶]  In contrast, an amended pleading that adds a new plaintiff will not relate back to the filing of the original complaint if the new party seeks to enforce an independent right or to impose greater liability against the defendants.

San Diego Gas & Electric Co. v. Superior Court, 146 Cal.App.4th 1545, 1550 (2007) (citations omitted) (rejecting relation back doctrine as a mere technical change of capacity on the same causes of action where heirs in a wrongful death action sought to belatedly add the decedent's widow in an amended complaint which would have greatly increased defendant's potential liability).

In this case, applying the foregoing principles, the Court would be inclined to permit the substitution of the minor children in a successor in interest capacity, but for its conclusion, on the merits of the summary judgment motion, such substitution would be futile.

### C.   Merits

Reaching the Motion merits, applying Rule 56 standards, the Court finds no triable issue of material fact, with Defendants entitled to judgment in their favor as a matter of law.

#### 1.   Excessive Force

Defendants Aitken and Spach contend they are entitled to summary judgment on the federal civil rights excessive force claim because their use of force was justified under the Fourth Amendment, they are entitled to qualified immunity based on the information available to them at the time in making decisions in dangerous circumstances, and differences of opinion regarding the deputies' tactical choices do not defeat a qualified immunity demonstration.

Plaintiff argues in opposition Spach's actions created a dangerous situation under the "state-created danger" doctrine, an exception to the DeShaney v. Winnebago County Dep't of Soc. Serv., 489 U.S. 189, 196-97 (1989) principle the Due Process Clause does not require the state to provide its citizens with a minimum level of security, so it follows the state cannot be held liable for failing to do so.   The recognized exception Plaintiff relies on is a theory that liability exists when a state officer's conduct places a person in peril in deliberate

06CV1322

indifference to the person's safety.  <u>Wood v. Ostrander</u>, 879 F.2d 583, 587 (9th  Cir. 1989) (plaintiff stated a Section 1983 claim where state trooper left passenger of an impounded vehicle stranded at night in high crime area, resulting in her rape by a stranger from whom she accepted a ride).  The Court finds that theory inapplicable to these facts, where officers responding to a report from citizens requesting law enforcement assistance found themselves in an escalating confrontation triggered by the aggressive and threatening responses from the object of the report's concern.

Plaintiff strenuously argues various inferences it contends a jury could use to find "AITKEN engaged in the equivalent of cold-blooded murder."  Opp. 24:27-28.   Based on certain minor discrepancies in the percipient witnesses' descriptions of the events leading up to the fatal shooting, Plaintiff argues a jury could find in favor of  the Plaintiff on the excessive force claim.[7]  However, the Court finds Plaintiff identifies only one "material issue in dispute:  namely whether Mr. GARCIA-VASQUEZ was armed at the time of the second and third shots."  Opp. 25:15-16.   As discussed below, the evidentiary record actually resolves that dispute in a manner supporting entry of judgment as a matter of law for the deputy defendants.

In consideration of the parties' Joint Statement Of Undisputed Facts, and other evidence from percipient witnesses in the record before the Court, by  no stretch of the range of reasonable inference could the incident be construed as a situation in which an "unarmed" victim has suffered the "promiscuous use of deadly force."  Opp. 1:20. Garcia-Vasquez assaulted deputy Spach, threw a potentially lethal cast iron weight at him, continued to

---

[7]   For example, the Opposition is couched in a manner apparently  intended to raise doubt about the integrity of the Vista sheriff's department, including inferences of racial animus with respect to officer shootings:   "During a five day period in the Summer of 2005, Sheriff's deputies in Vista California shot and killed three Hispanic men in separate incidents," two of whom were allegedly unarmed (Opp. 1:2-4); "It is important to note that this was the first of three shootings by Sheriff's Deputies in Vista," where "Deputies ma[de] the equally implausible claim that they saw the decedent reaching for an unseen, but suspected weapon" (Opp. 25:19-21), so that "[a] reasonable jury when confronted with these facts could easily conclude that Sheriff's deputies, based on their law enforcement training and knowledge of the relevant legal standards, know when to fabricate furtive gestures and place them in narratives to justify post-hoc their promiscuous use of deadly force" (Opp. 25:21-25). The racial overtone Plaintiff injects, with the unsupported inference the police lied here, relies on no case-specific fact to justify the implication.

advance toward him across a room while the deputy retreated, and remained combative despite pepper spray to the face at the inception of the confrontation beginning in the bedroom, eventually cornering deputy Spach who had no route of escape, with deputy Aitken firing to protect the officer and the others present from Garcia-Vasquez's threat.   Deputy Spach declares as he retreated backwards, he was focused on Garcia-Vasquez's right hand after he threw the dumbbell, which was in a fist, then opened and dropped down, reaching for a bulge in his right front trouser pocket.   Deputy Spach recalled during his earlier encounter with Garcia-Vasquez the man had stated he had weapons, needles, or drugs. Spach Decl. ¶ 10.  He believed Garcia-Vasquez was reaching for another weapon to kill or seriously injure him.  Id.  He had concern for the couple who had called law enforcement, who were at close proximity, should Garcia-Vasquez succeed in disabling him.  Id.

Plaintiff's expert witness on police procedures, Jack Smith, provided an Expert Witness report (Opp. Exh. 10), a Rebuttal Expert Witness Report (Opp. Exh. 11), and deposition testimony (Opp. Exh. 9).  His December 31, 2007 Expert Witness Report provides the context for his conclusion, from his review of the evidence and factual record available at the time, that the deputies recognized Garcia-Vasquez was mentally ill, was becoming more aggressive, and was possibly in possession of weapons.  Opp. Exh. 10 p. 9.  He contends the officers should have "call[ed] Mr. Vasquez to a predestinated [*sic*] and tactically advantageous position outside the home" rather than responding to the report of the homeowners by entering the house and an unsearched bedroom "to confront Mr. Vasquez." Opp. Exh. 10 p. 10.  As a result of that tactical decision, Mr. Smith opines:

> [T]he deputies and reporting parties were confronted by a mentally disturbed and unsearched man who had armed himself with 10 pound barbells.  The deputies were aggressively attacked by Mr. Vasquez when he advanced toward the deputies and threw one of the barbells at Deputy Spach, striking the deputy on his arm as he retreated from Sergio's room.  The deputies and reporting parties were placed in an extremely dangerous crossfire situation and used deadly force to extricate themselves from an extremely disadvantageous tactical situation.

Opp. Exh. 10 p. 10.

06CV1322

Mr. Smith characterizes the tactical decisions leading up to the confrontation as "unsound procedures" which led to a situation where they were actually subjected to the risk of "serious injury as a result of Mr. Vasquez striking them with the barbells."  Opp. Exh. 10 p. 10.  "It is clear he posed a danger to at least Deputy Spach."  Id.  In those circumstances, he opines "Deputy Spach's use of pepper spray and the drawing fo his weapon seem reasonable."  Id.  He further opines "the firing of the first shot which missed Mr. Vasquez while he was attacking Deputy Spach were [*sic*] justifiable, according to Sheriffs Department policy and was not unlawful."  Id.   However, based on an uncertainty from the incomplete evidentiary record whether Garcia-Vasquez was still holding the second dumbbell, after having thrown the first one at the officer, while he continued to advance toward deputy Spach, Mr. Smith opines:  "if the second shot fired by Deputy Spach, striking Mr. Vasquez in his thigh, and the third and fatal shot fired by Deputy Aitken, striking Vasquez in the back, were discharged to protect Deputy Spach f[ro]m being attacked by Mr. Vasquez using 'only' his fists, the use of deadly force was not necessary, excessive and in my opinion not consistent with the use of force policy of the San Diego County Sheriffs Department."   Id.  Mr. Smith's conclusions on the issue of excessive force are entirely predicated on the premise Garcia-Vasquez may have dropped the second dumbbell while advancing on deputy Spach so that his only threat may have been his fists.

In his January 21, 2008 Rebuttal Report to defendant's expert witness' conclusions, Mr. Smith reviews the expert opinions of Defendant's expert, Mr. E. J. Pellegrino.  Mr. Pellegrino concluded, in contrast to Mr. Smith, at the time deadly force was used, it was justified.  The two experts concur the use of pepper spray and the drawing and firing of deputy Spach's weapon in response to the thrown dumbbell were proper responses and not excessive force.  They also concur the propriety of the use of force must be examined in the context of the situation the deputies confronted when they opened the bedroom door, with the use of deadly force "viewed from the perspective of the deputy at the scene, who is forced to make split second decisions under circumstances that are not only tense and uncertain, but rapidly changing and most importantly without the advantage of 20/20

06CV1322

hindsight." Opp. Exh. 11 p. 9.  Mr. Smith concedes "Spach had been backed close to a wall in the living room and had reason to fear that he could not retreat further." Id. p. 8.  The entire fatal incident lasted approximately three minutes.  Mr. Smith apparently relies on his opinion "the deputies used improper tactics and placed themselves in a tense and dangerous situation where they were forced to make 'split second' and deadly decisions" as the basis for his conclusion the use of deadly force was excessive because they ought to have approached the situation from the outset by applying procedures appropriate for dealing with mentally ill persons. Id.  However, Mr. Smith substantiates:  "the issue of the location of the second barbell needs to be addressed during future depositions." Id.

Subsequent percipient witness testimony resolved that uncertainty.  Accepting the expert's opinion the location of the second dumbbell is a crucial fact affecting the use of force analysis, Defendants offer the following evidence.  Deputy Aitken declares:

> Deputy Spach had retreated into a wall with no where to go. Garcia-Vasquez was swinging the dumbbells at Deputy Spack in an apparent effort to kill or seriously injure him when I fired my weapon.  The sofa was between me and Garcia-Vasquez when I fired.  With my arm extended over the sofa, the muzzle of my weapon was about one to two feet from Garcia-Vasquez when I fired my weapon.  Garcia -Vasquez fell to the floor when I shot him.  Because Deputy Spach was in immediate threat and danger of death or serious injury from Garcia-Vasquez' attack on him with the dumbbells, in defense of Deputy Spach's life and safety and to stop the threat presented by Garcia-Vasquez, I fired my handgun at Garcia-Vasquez.

Aitken Decl. ¶ 9.

Asuncion Perea testified at her January 28, 2008 deposition:

> Q:  So when the deputy was retreating, walking backwards, he had to walk backwards all the way to the main entry to the house and then turn and continue into the living room.
>
> A:  . . .  Yes.
>
> Q:  . . .  When the deputy was retreating, walking backwards into the living room, Mr. Sergio Garcia was still hitting him with the weights?
>
> A:  He continued.  He continued.

Perea Depo. 31:5-13, Opp. Exh. 7.

Pedro Ramirez testified at his January 28, 2008 deposition:

> Q:  And did Sergio Garcia follow that deputy into the living room?
>
> A:  Yes.  Yes.  He followed him, hitting him.
>
> Q:  And he continued – he, Sergio Garcia, continued to hit that officer with the weights?
>
> A:  Yes.

Ramirez Depo. 23:25-24:5, Opp. Exh. 8.

At  his March 28, 2008 Deposition, after Mr. Ramirez and Ms. Perea had testified at their depositions subsequent to Mr. Smith's expert and rebuttal reports but before he had reviewed their testimony, Mr. Smith testified:

> Q:  . . .  If Mr. Garcia-Vasquez had barbells in his hands at that time, as reported by Mr. Ramirez and Ms. Perea, then Deputy Aitken's discharge of his firearm at Mr. Garcia-Vasquez  would have been reasonable?
>
> A:  Well, not just having them in his hand.  Using them in a threatening manner that would indicate that he was going to cause Deputy Spach death or serious bodily injury.  **If that is what they believe occurred and if that's, in fact, what did occur, then in my opinion the shooting would be reasonable.**

Dkt No. 36-2, Def.'s Suppl. Lodgment, pp. 70-71 (emphasis added).

The Court concludes Plaintiff has failed to raise a triable issue of fact on the excessive force issue, and in consideration of the evidentiary record, as a matter of law the deputy defendants did not use excessive force in causing Garcia-Vasquez's death in the circumstances they confronted.

### 2.    Qualified Immunity

Even if excessive force was used, Defendants contend the police officers are entitled to qualified immunity.  As they observe, "disagreement over the deputies' tactical choices does not prevent [a finding] of qualified immunity."  Mot. 15:24-25.  Tactical responses to a threat do not provide a basis for liability.  Billington v. Smith, 292 F.3d 1177 (9th Cir. 2002).

In suits against police officers, the Supreme Court has defined a two-part analysis to determine whether qualified immunity protects the defendants from liability.  Saucier v. Katz, 533 U.S. 194 (2001).  First, a court considers whether the facts alleged show the officer's

conduct violated a constitutional right.  Id. at 201.  Second, if a colorable claim for a constitutional violation can be made from the facts, the court determines whether the constitutional right was clearly established in the particular context of the case.  Id. 201-02 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted").

Deputies Spach and Aitken contend they are entitled to qualified immunity because no constitutional violation occurred, establishing an essential element of that defense.  The undisputed facts permit only one reasonable inference:  probable cause existed for these defendants to believe deputy Spach was threatened by and in imminent danger of incurring death or serious bodily harm from a combative Garcia-Vasquez in a situation where it was known he had disposed of only one of two cast iron weights (and that by throwing it at deputy Spach), and he continued to advance against a cornered Spach.

Plaintiff argues in opposition the question "whether qualified immunity lies cannot be resolved at the summary judgment stage because of the existence of genuine disputes of material fact." Opp. 26:4-5.  However, that argument rests on Plaintiff's conclusory argument a lesser alternative to the deadly force would have been more reasonable.  "An officer cannot be expected to accurately anticipate all of the possible responses a subject may have to  his commands then tailor his actions accordingly in order for his conduct to fall into the category of what is considered reasonable."  Reynolds v. County of San Diego, 84 F.3d 1162, 1169 (9th Cir. 1996), *overruled on other grounds by* Acri v. Varia Associates, Inc., 114 F.3d 999 (9th Cir..1997).  The standard of review is objective, not speculatively subjective.  As quoted in the Motion:

> [U]nder Graham, we must avoid substituting our personal notions of proper police procedure for the instantaneous decisions of the officer at the scene.  We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day.  What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

Smith v. Freland, 954 F.2d  343, 347 (6th Cir. 1992).

Even had the Court not determined Plaintiff has failed to identify a material issue of triable fact on the excessive force issue, the Court finds from this record no reasonable jury could answer the dispositive question on qualified immunity in use of force situations other than in the negative :  "whether it would be clear to a reasonable officer that his conduct was unlawful in the specific situation he confronted."  <u>Saucier</u>, 533 U.S. at 202. Summary judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict."  <u>Anderson.</u> 477 U.S. at 250-251.

### 3.    <u>Municipal And Supervisory Liability</u>

To succeed on a Section 1983 claim against a municipality, the plaintiff must demonstrate first, the seizure was unconstitutional and second, the municipality was responsible for that constitutional wrong.  <u>Monell</u>, 436 U.S. at 690-94.  Defendants San Diego County and captain Ahern contend the Estate's <u>Monell</u> claims are without merit because no violation of Garcia-Vasquez's constitutional rights occurred, no evidence exists of any deliberately indifferent policy or custom adopted by any county policymaker that caused any use of force constitutional violation, and the Estate's supervisory liability claim against captain Ahern is merely a mislabeled municipal civil rights claim against the county. In its Opposition, the Estate "agrees to the dismissal of Defendant AHERN, who is named in the Fifth Claim for Relief 'Supervisory Liability – 42 U.S.C. § 1983."  Opp. 1, n.2. Accordingly, defendant Ahern and the Fifth Cause Of Action are **<u>DISMISSED</u>**, with prejudice.

Plaintiff identifies no policy, practice, or custom regarding the use of force by sheriff's deputies at the Vista Station adequate to impute to the municipality itself the requisite causal connection to the harm.  Plaintiff cites the correct standard:

> There are three ways to show a policy or custom of a municipality:  (1) by showing "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate."

\\

Opp. 28:13-19, *quoting* Ulrich v. City and County of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002), *citing* Monell, 426 U.S. 658.

The Opposition correctly observes a municipal policy "may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." Nadell v. Las Vegas Metro Police Dept., 268 F.3d 924, 929 (9th Cir. 2001). In support of the application of that principle to this case, Plaintiff contends, in reliance on the testimony of captain Ahern, "[i]n 2005 within the span of three and a half months, Sheriff's deputies in Vista shot and killed four people in different incidents." Opp. 28:24-25. On May 15, 2005, deputy Spach shot someone named Ramon Torres. Opp. 28:26-27. On July 28, 2005, deputies Spach and Aitken shot Garcia-Vasquez. On July 29, 2005 and on August 1, 2005, two other sheriff's deputies fatally shot two other individuals. Opp. 28:24-29:1. While Plaintiffs attempt to show a "widespread practice" or "evidence of repeated constitutional violations" through the four fatalities in police encounters over three and one-half months in 2005,[8] imputing racial animus on the part of "errant municipal officers" which were purportedly tolerated by the municipality, is no more than vaguely suggested.

Similarly, the *causation* connection Plaintiff would have the Court infer between the absence of Tasers in the Sheriffs Department at the time and the fatal result in this and the other cited incidents[9] is to insubstantial to sustain the claim. From those bare statistics, and despite deputy Spach's attempt at the inception of the incident to get Garcia-Vasquez to drop the dumbbells by spraying him in the face with pepper spray, to no effect, Plaintiff challenges **the lack of** "training and arming of its Sheriff's Deputies with weapons which provided the opportunity of less than lethal, but effective, force, was unconstitutional." Opp. 29:13-15. Plaintiff acknowledges "[n]one of the deputies in San Diego County had Tasers available for their use" until later in the year 2005. Opp. 29:2-3; Opp. Exh. 3, Ahern Depo.

---

[8]   Opp. Exh. 3, Ahern Depo. pp. 30-31.

[9]   "All of the decedents had Hispanic surnames; none of the deputies were [*sic*] Hispanic or Latino." Opp. 29:1-2.

06CV1322

p. 37 (observing the County Sheriff, not himself, would be the decision-maker regarding equipping patrol personnel with Taser weapons).

Even assuming a constitutional violation occurred in the manner deputies Spach or Aitken responded to the threat Garcia-Vasquez presented to themselves and others present at the time, which the court concludes no reasonable jury could find in consideration of the undisputed facts of this case, the basis for Plaintiff's assertion of a <u>Monell</u> claim involves no allegedly unconstitutional affirmative practice, procedure, or custom. Plaintiff predicates the County's liability on the absence of a particular weapon in the arsenal of its deputy sheriffs until a few months after Garcia-Vasquez was killed. No triable issue of material fact emerges from that particular example of municipal action. Moreover, captain Ahern has been voluntarily dismissed from the action, so the statement of the <u>Monell</u> claim as reiterated in the Opposition is defective to the extent all the County liability is associated with alleged omissions by the Vista Station captain: "Ahern" having made "no recommendation regarding the use of Tasers or other alternatives to lethal force to anyone in the Sheriff's Department" (Opp. 29:5-6); Ahern having "made no recommendation for additional training" (Opp. 29:6-7); Ahern not issuing "any memorandum or bulletin to the deputies in Vista regarding the rules concerning deadly force or when it might properly be used (Opp. 29:7-9); "[a]fter the first homicide he took no action to send a memo or bulletin to deputies regarding the appropriate use of deadly force" (Opp. 29:9-10); "Ahern sent no memo, no bulletin nor any reminder to the deputies of the Vista station regarding the appropriate and inappropriate use of deadly force in their work" (Opp. 10-12). All those specific omissions relate to that individual's post-incident conduct or conduct in the nature of a reminder to reinforce the formal training all sheriffs' deputies, including these individual defendants, received from a specialized academy on the use of force in the conduct of their jobs, according to undisputed evidence provided in support of their Motion.

As a matter of law, even had it not concluded no unconstitutionally excessive force was used against Garcia-Vasquez, the Court finds the conduct alleged in support of a <u>Monell</u> cause of action against the municipality has no conceivable causal relationship to the

incident resulting in the fatal shooting of Garcia-Vasquez, and thus with no culpability imputable to the deputies' municipal employer.

### 4.   Pendant State Law Claims

Deputies Aitken and Spach cannot be found liable for the survivor claims because Plaintiff failed to identify a triable issue of material fact their use of deadly force was not privileged, and no intentional or negligent tort liability arises from justifiable homicide. Disagreement over an officer's tactical choices does not give rise to state tort liability. Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994) ("as the text of the Fourth Amendment indicates, the appropriate inquiry is whether officers acted reasonably, not whether they had less intrusive alternatives available to them"), *citing, inter alia*, Illinois v. Lafayette, 462 U.S. 640, 647 (1983).  As noted in Plaintiff's Opposition, the "state law claims are based on the same facts as the[] § 1983 claims." Opp. 29:19-21.  They fail for the same reasons as the federal claims, on an evidentiary record from which no triable issue of material fact emerges.

## III.   CONCLUSION AND ORDER

For all the foregoing reasons, **IT IS HEREBY ORDERED** Defendants' Motion For Summary Judgment is **GRANTED**, the parties' Joint Motion To Continue Pretrial Conference And Related Dates is **DENIED** as moot, with all scheduling dates vacated, and this action is dismissed in its entirety as to all claims and all parties.

**IT IS SO ORDERED**.

DATED:  September 8, 2008

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge